### 285. HASTINGS & COMPANY v. CHRISTOPHER.

1. The settlement of issues of fact is the exclusive prerogative of the jury. The Court of Appeals, by the express terms of its creation, was established for the correction of errors of law and in equity only.

2. When enough legal evidence is submitted by both plaintiff and defendant to create a manifest issue as to the material contention of each, or to raise a doubt as to the veracity of any witness in such case, the settlement of such issue of fact, as well as the solution of such doubt, is exclusively within the province of the jury.

3. A verdict of a jury, approved by the trial judge, will not be disturbed by this court when it appears (no matter in how many various forms the question may be presented) that the motion for new trial is urged solely on the ground that the verdict is contrary to evidence, unless it be made to appear that the verdict is totally unsupported by the evidence. If there is no evidence to support a verdict, such verdict is, for that reason, contrary to law; and, in such case, to refuse a new trial would be such error of law on the part of the lower court as that this court could constitutionally correct it, and should do so.

43

4. The Court of Appeals is without jurisdiction to consider an assignment of error addressed solely to the finding of the jury upon issuable facts.

Action for breach of contract, from city court of Atlanta—Judge Reid.    November 24, 1906.

Argued April 10,—Decided April 25, 1907.

*E. M. & G. F. Mitchell,* for plaintiffs in error.

*Dorsey, Brewster, Howell & Heyman, A. H. Thompson,* contra.

RUSSELL, J.    Christopher sued Hastings & Co., in the city court of Atlanta, for damages resulting to him from a breach of contract entered into between the parties with reference to the sale of a large quantity of cottonseed, which Hastings & Co. agreed to buy, but which they declined to accept, on the ground that the seed did not come up to the sample by which they were sold.    It is insisted with great earnestness, by counsel for the plaintiffs in error, that Christopher filed no replication denying their plea that the sale was by sample, and that Christopher did not, as a witness, deny that the sale was by sample, until after both sides had finished their direct testimony, "when he went upon the stand and testified that the trade was that 'due allowance should be made for defects appearing in a crop lot;'" and counsel argue that if Christopher "had not testified, in rebuttal, to a different sort of a contract from the one on which the case had heretofore been tried, he would have been without evidence to sustain his case;" that "the jury could only have rendered the verdict they did by accepting Christopher's testimony to a different sort of a contract, when he went on the witness stand a second time."

No matter at what stage of the testimony the evidence was introduced, the question of its credibility was solely for the jury. The argument addressed to us could be considered by the jury, but it comes too late when presented here.    The only question we can consider in regard to the evidence is that of its legal sufficiency or insufficiency to support the finding reached by the jury.    The constitutional amendment creating the Court of Appeals, in its express terms, restricted it to the correction of errors of law and in equity only.    If a verdict is without evidence to support it, it is, for that reason, contrary to law, and this court can correct that error.    But if the verdict is the settlement by the jury of disputed issues of fact, and if there is any evidence to authorize the finding,

this court is without jurisdiction. It is the exclusive prerogative of the jury to settle every issue of fact to be determined; and where there is an issue of fact, that power of the jury is paramount and exclusive. The trial judge has discretion conferred upon him to review the evidence upon the motion for new trial. This court has no such discretion. We can only determine from the evidence in a case, where there is no evidence to support a verdict which has been approved by the trial judge, that, for that reason, such verdict is contrary to law. The subject has been fully treated by this court in *Davis* v. *Kirkland, Stricklin* v. *Crawley,* ante, 5, 139, and other cases. It is useless to expend argument, labor, or money in prosecuting writs of error directed solely to the fact that the witnesses of the defendant in error were believed in preference to those of the plaintiff in error. Nor will it alter the case when skilful counsel present the matter in varied and various forms. It can be said once for all that this court has neither the power nor the disposition to assume the duty of the jury in determining the credibility of witnesses.

While the plaintiffs in error sustained by their testimony the contention that the cottonseed in question were bought by sample, and that the seed were not up to the sample, still, by a review of the testimony for the defendant in error, it is placed beyond any question that the defendant in error (plaintiff in the court below) was fully entitled to the verdict awarded him by the jury, in case the jury, as they had a perfect right to do, preferred to believe the testimony he submitted. The evidence disclosed that Hastings & Co. are seedmen, dealing in garden and farm seed of all descriptions, and doing a large business in cottonseed. In the summer or early fall of 1904, Christopher was approached at his home in LaGrange, Ga., by an agent of Hastings & Co., and asked if he had any of his seed for sale. Christopher replied that he had none of his own growth, but that he controlled a crop lot, which was grown from the Christopher seed. The agent asked him to get him a sample of the seed and take it to Atlanta, and said that, no doubt, he and Mr. Hastings could make a trade about it. The seed that Christopher had in view was the crop for 1904 and 1905, grown by W. F. Hinds, a farmer in Troup county. Christopher thereupon got a sample of seed from Mr. Hinds, took out some of it to take with him to Atlanta, and kept the remainder

of the sample at LaGrange. He came to Atlanta to see Mr. Hastings, and, after a considerable discussion, made a trade with Mr. Hastings; as a result of which Hastings agreed to pay him seventy cents per bushel for the entire crop grown on the plantation of Mr. Hinds, to run up somewhere about three thousand bushels. Hastings had been making very large preparations for the coming season, and, for that reason, desired credit extended him; which was agreeable to Christopher. It was agreed that one half the purchase price should be paid the next February, and the balance a little later. There was a dispute between Hastings and Christopher as to the exact terms of the contract. Hastings was to send sacks to sack the seed. Hastings claimed that he bought the seed strictly according to sample. Christopher testified that while the quality of the seed was evidenced by a sample, it was agreed between the parties that due allowance should be made for a crop lot. It was understood, however, that the seed were not to be picked seed, but were to be as coming from the ginnings. Hastings' contention was that the sample shown him by Christopher was the finest he had ever seen—practically free from faulty seed, and that he was entitled to seed of substantially the same character. Christopher contended that while they sat talking together, Hastings, either consciously or unconsciously, picked out the faulty seed in the sample he brought to Atlanta, and threw them away.

As the season advanced the seed business showed signs of great depression; cotton went down, and there was not near the demand for cottonseed that Hastings & Co. had expected. They therefore did not ask for delivery. Christopher began calling on Hastings & Co. to give instructions with reference to the seed, and to send some one down to receive them. Hastings & Co. began then writing letters explaining the hard times in their business, and that the seed would probably have to be dumped into an oil mill, and suggesting that Christopher give this direction to the seed, and that they would give their notes, payable at some time off, for the difference between the contract price and the price obtained from the oil mill. This was not satisfactory to Christopher and finally, on his repeated demands that Hastings & Co. send somebody down to inspect and receive the seed, Hastings & Co. sent a Mr. Holder for that purpose. He went in alone where

the seed were, and, after having been in the house fifteen or twenty minutes, came out with a small sack of cottonseed, which he undertook to compare with what he claimed to be the sample given him by Hastings & Co. as the sample upon which the trade was based. Holder claimed that the sample seed were better than the seed he had himself taken out of the sacks. Christopher and Hinds claimed that the seed were substantially the same. Holder returned to Atlanta, making the statement to Christopher that the seed were too good to be dumped into an oil mill, and that he was going to endeavor to get Hastings & Co. to hold the seed for the next crop. Upon his return to Atlanta, Hastings wrote a letter rejecting the seed on the ground that they were not up to sample.

On the trial of the case four samples of seed were offered in evidence and considered by the jury: the sample that Hastings claimed was the trade sample, but from which Christopher claims Hastings had picked out the faulty, leaving only the best seed; a sample that Christopher claimed was part of the sample that he brought with him to Atlanta, but which appeared to have in it a few more faulty seed than the sample Hastings produced in court; the sample that Hastings claimed had been brought to him by Holder, and which seemed to contain a few more faulty seed than any of the other samples; and a sample which was produced by Christopher as a sample taken out of the seed which had been rejected. All of these samples were allowed to go out with the jury, and the evidence showed that all of them were the same general character of seed, some of the witnesses testifying that they looked substantially the same, and some of the defendants' witnesses testifying that what Hastings called his "trade sample" had fewer faulty seed than any of the others, and that the sample which was rejected contained more faulty seed than any of the others. The evidence made it clear that a sample of cottonseed could be manipulated, either by picking out the faulty seed and thus improving the appearance of the sample, or by picking out the good seed and thus injuring the appearance of the sample. The evidence for the plaintiff showed that the seeds tendered were up to sample, and that the trade sample offered by Hastings & Co. had the evidence of having been picked; and Christopher swore that Hastings had picked the faulty seed out of it. The evidence further showed that Hastings stood to lose a considerable sum

on account of this contract, and that when it became evident that he was endeavoring to get out of the contract, it was too late for Christopher to make any other disposition of his seed.    The strong preponderance of the evidence was in favor of the plaintiff's contention in the cause.    The jury evidently took into consideration all of the circumstances that developed, and properly returned a verdict for the plaintiff.          *Judgment affirmed.*